UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
------------------------------ x
                               :
 UNITED STATES OF AMERICA,     :
                Plaintiff,  :     Criminal No.
                            : 3:18-CR-00090 JAM-6
           vs.              :
                            :     May 9, 2018
 CRUZ FERNANDEZ,            :
                Defendant.  :
                            :
------------------------------ x
```

Federal Building
450 Main Street
Hartford, Connecticut


DETENTION HEARING


(Transcription from Electronic Recording)


Held Before:

THE HON. DONNA F. MARTINEZ
United States Magistrate Judge


Transcription Services of
FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT  06070
860.651.0258
www.falzaranocourtreporters.com

```
A P P E A R A N C E S :
```

<u>For the Plaintiff:</u>

  OFFICE OF THE UNITED STATES ATTORNEY
  450 Main Street - Room 328
  Hartford, Connecticut 06103
  860-947-1101
  brian.leaming@usdoj.gov
    BY:  BRIAN P. LEAMING, ESQ.
      Assistant U.S. Attorney


<u>For the Defendant:</u>

  SILVESTER & DALY
  300 State Street - Suite 507
  New London, Connecticut 06320
  860-278-2650
  rfk@law-sk.com
    BY:  ROBERT F. KAPPES, ESQ.

```
1                    (Proceedings commenced at 11:41 a.m.)

2

3                    THE COURT:  Good morning.

4                    This is United States vs. Cruz

5          Fernandez, 18-Criminal-90 assigned to Judge

6          Meyer.

7                    Will you identify yourselves please?

8                    MR. LEAMING:  Good afternoon, your

9          Honor.  Brian Leaming on behalf of the

10         United States.

11                   MR. KAPPES:  Good afternoon, your

12         Honor.  Robert Kappes for Mr. Fernandez who

13         is seated to my right.

14                   THE COURT:  All right.

15                   We are here for the Defendant's

16         detention hearing.  Let's hear first please

17         from the Government.

18                   MR. LEAMING:  Thank you, your Honor.

19                   As the Court is aware by now Mr.

20         Fernandez has been charged in a multi-

21         defendant, multi-count indictment.  He's

22         alleged to have engaged in a conspiracy to

23         distribute heroin and fentanyl.  He's also

24         charged with the actual distribution of a

25         quantity of heroin and fentanyl.
```

1            The investigation focused principally

2       on a gentleman by the name of Wilson Velez,

3       also known as "Wiso."  Mr. Velez at the time

4       was one of two regional officers for the

5       Latin Kings in the State of Connecticut and

6       was the highest ranking Latin King in

7       Hartford at the time of the investigation.

8       Mr. Velez was engaged in an ongoing drug

9       conspiracy was well with respect to the

10      distribution of heroin, fentanyl and

11      cocaine.

12            Over the course of the investigation it

13      involved a series of controlled drug

14      purchases, principally from Mr. Velez as

15      well as some of his associates.  And then in

16      August of 2017 United States District Judge

17      Alvin Thompson authorized the interception

18      of a telephone being used by Mr. Velez.

19            The wiretap phase of the investigation

20      continued, and then in September the

21      Government received authority to intercept

22      the second phone used by Mr. Velez.  It

23      appeared at that point Mr. Velez was

24      compartmentalizing his criminal activity.

25      He had a lot of Latin King discussions on

1 the one phone and more drug-related

2 discussions on the second phone.  It was on

3 that second phone through the course of the

4 investigation that we identified Mr.

5 Fernandez.

6  A lot of the criminal activity in which

7 Mr. Velez was involved occurred around the

8 area of Elliott Street and Wethersfield

9 Avenue.  Mr. Velez ultimately opened up a

10 store almost on the corner, it was actually

11 a couple stores down from Elliott Street.

12 But Elliott Street was sort of a -- would

13 sort of come to be sort of an undeclared

14 territory in the Hartford South End.  That

15 is it wasn't really controlled by the Latin

16 Kings or other street gangs, but there were

17 a number of people associated with the Latin

18 Kings that were engaged in narcotics

19 trafficking at that area, and in particular

20 22 Elliott Street which is a larger

21 apartment building located there.

22  THE COURT:  So does Elliott Street run

23 off Wethersfield?

24  MR. LEAMING:  It does.

25  THE COURT:  Okay.

1          MR. LEAMING:  Through the course of the

2     investigation as I indicated we started

3     intercepting Mr. Velez communicating with

4     Mr. Fernandez.  It appeared that Mr. Velez

5     was supplying quantities of narcotics to Mr.

6     Fernandez, which were then sold in that area

7     of 22 Elliott Street.

8          About mid-September Mr. Velez became

9     alerted by a cousin that he may have been

10     the focus of federal law enforcement and

11     then he thereafter transferred most of his

12     criminal activity to other phones.  It was

13     during this time when we were trying to

14     ascertain whether Mr. Velez was going to

15     obtain a new phone we sent a confidential

16     source to do another buy from Mr. Velez.

17     That was on September 16th.  During the

18     course of that buy Mr. Velez got Mr.

19     Fernandez here to actually deliver 500 bags

20     of what turned out to be heroin mixed with

21     fentanyl to the confidential source.

22          After that the investigation sort of

23     continued as to Mr. Velez, largely trying to

24     ascertain which phone or phones he was using

25     to facilitate his drug trafficking

1          organization.  That lasted until about late

2          November of 2017.  The Government had

3          obtained a roving authority to intercept Mr.

4          Velez which expired at the end of November.

5          Mr. Velez was arrested in early December

6          2017.

7               Mr. Velez and a number of people that

8          were selling narcotics, not just Mr.

9          Fernandez, but essentially that's what Mr.

10         Fernandez's role was; he was a street level

11         drug dealer operating principally in the

12         Elliott Street area during the course of the

13         investigation.

14              Now, through the course of the

15         investigation there were multiple instances

16         of which Mr. Velez and others were involved

17         in crimes of violence.  During that period

18         of time there was a split in the Latin Kings

19         along two factions that were sort of going

20         back and forth with each other, sometimes

21         employing violence.

22              THE COURT:  How do you know that?

23         What's the basis of the information?

24              MR. LEAMING:  So we had some

25         confidential sources, your Honor.  We had

1           some intercepted prison calls with some

2           other Latin King members discussing it, and

3           then through the course of even subsequent

4           to the arrest of Mr. Velez we've interviewed

5           a number of people what were involved

6           largely corroborated that.

7                THE COURT:  Um-hum.

8                MR. LEAMING:  At the time of the

9           wiretap however there was an incident

10          involving Mr. Fernandez which I think the

11          Court should be aware, so I'm not going to

12          try to throw too many names at you, but one

13          of the co-Defendants in this case is a

14          gentleman by the name of Josh Amaral.  His

15          street name is "Ill Child."

16               Mr. Amaral --

17               THE COURT:  Ill, I-L-L?

18               MR. LEAMING:  Yes.

19               Mr. Amaral is longtime Latin King.  He

20          had multiple arrests.  He's an admitted

21          Latin King; he's been designated by the

22          Department of Correction as a Latin Kind.

23          He doesn't sort of even hide the fact that

24          he's a member of the Latin Kings.  He's

25          frankly based upon information obtained over

1          the years is proud of the fact of his

2          association.

3               Mr. Amaral is also suspected by other

4          Latin Kings to be a cooperator, an informant

5          for law enforcement.

6               On September 14th of last year while we

7          were intercepting Mr. Velez's phone at about

8          11:00 o'clock there was a shot spotter

9          notification --

10               THE COURT:  I'm sorry.  This was when?

11               MR. LEAMING:  September 14th of 2017.

12               THE CORUT:  9/14/17.  All right.  And

13          you were up on those two phones?

14               MR. LEAMING:  Correct.  At the time

15          Hartford Police got notified through their

16          shot spotter system that there was a shot

17          fired in the area of Elliott Street.

18          Officers responded.  They did find a shell

19          casing, but sort of more importantly they

20          was a number of intercepted phone calls

21          involving Mr. Velez related to that

22          shooting.

23               One of those calls occurred between Mr.

24          Fernandez -- it occurred just after 11:00

25          o'clock -- and Mr. Velez during which --

```
 1              I'll not use all of the colorful words that
 2         were used in this case, but there was a
 3         discussion --
 4              THE COURT:  So let me stay with you
 5         now.
 6              MR. LEAMING:  Sure.
 7              THE COURT:  It was a call that was
 8         intercepted after, sometime after the shots
 9         were fired, it was after 11:00 p.m. and it
10         involved Velez and the Defendant?
11              MR. LEAMING:  Correct.
12              THE COURT:  Okay.
13              MR. LEAMING:  So the shot fire was
14         about 11:00 o'clock; this call comes in from
15         Mr. Fernandez to Mr. Velez at just about
16         11:02 p.m.
17              During the call Mr. Fernandez tells Mr.
18         Velez, he's making a comment about he just
19         sealed his fate, he's going to take care of
20         this rat problem.  Again, I'm sort of
21         boiling down some of the less -- the more
22         colorful language, and then he starts
23         talking about this person pulled out on us.
24         And now Mr. Fernandez is talking, he says,
25         "I'm the wrong guy to be pulled out on."  In
```

1           reference based upon the monitors and the

2           wire I'm think that someone has just pulled

3           out a gun on him.

4                Velez asks who, and Mr. Fernandez says

5           "Ill."  And then tells Mr. Velez to tell

6           "Capone" if he's with him in the car with

7           him because they're about to flare it up, in

8           reference to we believe to be he's about to

9           -- if he sees Mr. Amaral he's going to shoot

10          him.

11               Mr. Capone or "Capone" is Randy Cortez.

12          Randy Cortez is one level higher than Mr.

13          Velez.  He's the state regional officer for

14          the Latin Kings or at least he was at the

15          time.

16               THE COURT:  Okay.  Let me stay with

17          you.

18               MR. LEAMING:  Sure.

19               THE COURT:  "Capone" is who?

20               MR. LEAMING:  Randy Cortez.

21               THE COURT:  And he's higher than Mr.

22          Velez?

23               MR. LEAMING:  Yes.  And there are

24          multiple recorded phone calls between Mr.

25          Cortez and Mr. Velez on the Latin King phone

1        where they talk about that, about his rank.

2        There was talk about, just for example, Mr.

3        Cortez was thinking about taking a new

4        position and that would cause Mr. Velez to

5        be elevated to his position within the Latin

6        Kings.

7            So the way we've interpreted this call

8        is that Mr. Fernandez is telling Mr. Velez

9        to make sure that Cortez is not in the car

10       because otherwise something -- he could get

11       shot.

12           Mr. Fernandez goes on to explain during

13       the same call that "Ill" had just pulled out

14       on "Fox."  "Fox" is another gentleman who is

15       associated with the criminal activity.  And

16       then Mr. Fernandez says, "I'm banging on

17       him, that's my brother, I'm banging on him."

18       And Mr. Velez responds sort of

19       affirmatively, not like it's a question, he

20       says, "Bang on him, bang on him."  Which

21       we've interpreted that Mr. Velez has now

22       authorized Mr. Fernandez to go ahead and use

23       violence against Mr. Amaral.

24           To confirm that at 11:08 that same

25       night and consistent with the call between

```
 1              Mr. Fernandez is that Mr. Velez calls Randy

 2              Cortez, aka "Capone."

 3                   THE COURT:  Who calls him?

 4                   MR. LEAMING:  Mr. Velez.

 5                   THE COURT:  Okay.

 6                   MR. LEAMING:  So to summarize at that

 7              point, so Mr. Fernandez is telling Mr. Velez

 8              that he's going to bang on "Ill," Mr.

 9              Amaral, and he's telling him make sure that

10              Mr. Cortez or "Capone" is not with him at

11              the time, otherwise he could get hit in the

12              crossfire.

13                   So that's what Mr. Velez does.  He

14              calls up Randy Cortez and he tells him to

15              stay away from him.  And he goes on to

16              explain he went over -- he went over and

17              pulled a hammer on "Fox," and Mr. Velez goes

18              on that he went crazy again talking about

19              Mr. Amaral, that he's tired of him, and he

20              says he knows those guys that I,

21              quote/unquote, fuck with are off limits.  He

22              knows that.

23                   And so "Capone" asks him, he pulled out

24              a hammer on "Fox," and then they talk about

25              yeah, he didn't, you know, nobody bothers
```

```
 1              with "Fox" and blah, blah, blah.
 2                   So the call largely corroborates what
 3              is about to happen.  There's a subsequent
 4              call between Mr. Fernandez and Mr. Velez
 5              where they continued to talk about it at
 6              about 11:11 p.m.  And so investigators
 7              basically conclude that we have a problem
 8              here.
 9                   So we dispatched a number of uniform
10              officers to the area of Elliott Street to
11              basically quell any potential for violence
12              which was successful, but given -- then
13              there were some other calls later not
14              involving Mr. Fernandez but involving Mr.
15              Velez where Mr. Velez is complaining about
16              Josh Amaral and the fact that he thinks he's
17              a snitch and sort of the fact now that he's
18              taken a shot at "Fox" allegedly the night
19              before there's a real danger now that we
20              think that either Mr. Fernandez, Mr. Velez
21              or others in their organization are going to
22              take some revenge on Mr. Amaral.
23                   So the following day on September 15th
24              we obtained a warrant for Mr. Amaral based
25              upon some controlled drug purchases that we
```

1    had done from him previously, and we

2    arrested him on state charges to get him off

3    the street.  We were successful getting a

4    high bond so he couldn't make his bond, and

5    Mr. Amaral never got out of custody again.

6    He was subsequently indicted in this

7    indictment and has been in custody ever

8    since.

9        This demonstrates to us, your Honor,

10    that certainly Mr. Fernandez, Mr. Velez were

11    prepared to engage in violence to settle a

12    dispute.  There was a large corroboration

13    based upon the shot spotter.  There was a

14    shots fired.  Mr. Amaral apparently did take

15    a shot at "Fox" who was an associate of Mr.

16    Fernandez and that they were going to settle

17    the score with Mr. Amaral by using violence.

18        THE COURT:  So you know, you said

19    Amaral apparently did take a shot against

20    "Fox."

21        MR. LEAMING:  Correct.

22        THE COURT:  The basis of that

23    information is this intercept?

24        MR. LEAMING:  This intercept, and we've

25    also interviewed some other people that were

1          generally familiar with the incident and

2          largely corroborated that Mr. Fernandez's

3          assessment was correct, that in other words

4          Mr. Amaral took a shot, pulled out a gun and

5          took a shot a "Fox" in the area of Elliott

6          Street on the night of September 14th.

7               We believe that series of events, your

8          Honor, is --

9               THE COURT:  So let me just --

10              MR. LEAMING:  Sure.

11              THE COURT:  -- make sure I understand

12         that.  So you have -- is it fair for me to

13         infer that you have confidential source

14         information from more than one person --

15              MR. LEAMING:  Correct.

16              THE COURT:  -- confirming that Amaral

17         did take a shot against "Fox" on 9/14 which

18         led to the shots fired report to the police.

19              MR. LEAMING:  Correct.

20              THE COURT:  All right.  Thank you.

21              MR. LEAMING:  And the phone calls were

22         from our perspective pretty compelling about

23         what the plan was going to be.  In other

24         words, Mr. Fernandez is calling up -- so Mr.

25         Fernandez is not a member of the Latin

1          Kings.  He's from Springfield.  He came down

2          to Hartford, knowingly associated himself

3          with Mr. Velez and the Latin Kings, but we

4          believe that he was associated in

5          Springfield with the Bloods street gang.

6          The Bloods do not have a fairly significant

7          presence here in Hartford particularly in

8          the South End, but that particular area as I

9          stated is sort of open, at least as far as

10         the drug trafficking area.  In other words,

11         it wasn't -- there are certain neighborhoods

12         where, you know, you have to be Latin King

13         or a Solido to actually successfully sell

14         drugs.

15              So to give you an example, in April of

16         last year there was an incident where a

17         person was selling supposedly cocaine on

18         Franklin Avenue near Barker Street, and Mr.

19         Velez, Mr. Amaral and three other Latin

20         Kinds went over there to basically tell him

21         you can't be selling on the block.  Over the

22         course of that incident a gunfight broke

23         out, the two guys that were allegedly

24         selling unauthorized were both shot and then

25         two of the Latin Kings were shot during the

1          course of that battle.  That happened about

2          11:00 o'clock in the morning, it was

3          captured on city surveillance cameras.

4               But the area of Elliott Street is sort

5          of open territory.  It's not -- so Mr.

6          Fernandez, even though he's not a Latin

7          King, could sell -- as it turns out he

8          develops a relationship with Mr. Velez and

9          starts buying heroin and fentanyl from Mr.

10         Velez and selling it in that area.

11              With respect to other factors --

12              THE COURT:  Are you inferring that or

13         do you have -- is that a theory or do you

14         have information to that effect?

15              MR. LEAMING:  Multiple sources

16         confirmed that Mr. Fernandez was buying

17         drugs for Mr. Velez.

18              THE COURT:  Okay.

19              MR. LEAMING:  And the most obvious one,

20         your Honor, on September 16th, this

21         confidential source calls Mr. Velez to buy

22         500 bags of heroin/fentanyl. They meet in

23         front of 22 Elliott Street.  Mr. Fernandez

24         shows up.  Mr. Velez directs him to go into

25         Elliott Street to get the drugs.  They were

1          actually intercepted calls between Mr.

2          Fernandez and Mr. Velez where he's telling

3          Mr. Fernandez to bring out 5 whole ones,

4          which is 5 stacks or 500 bags of heroin.  So

5          that transaction certainly at that point

6          confirmed our suspicion based upon other

7          intercepted calls that that was the nature

8          of their relationship.

9               And again, subsequent to that we've got

10         other source information that confirmed that

11         Mr. Fernandez was purchasing narcotics from

12         Mr. Velez.

13              THE COURT:  So did you ultimately

14         search 22 Elliott?

15              MR. LEAMING:  So 22 Elliott Street is

16         as I indicated a large apartment complex.

17         There were -- we could never identify

18         specifically which apartment was associated

19         with Mr. Fernandez at the time, so no.  But

20         also we were on the case for another -- on

21         the wire for another two and a half months,

22         so the probable cause largely would have

23         gone stale for us.

24              THE COURT:  Um-hum.

25              MR. LEAMING:  Other bits of information

1           I think that it would be important for the

2           Court to understand or know, according to

3           FBI anticipation of the arrests of Mr.

4           Fernandez and others, you know, in

5           additional to running a criminal history

6           also checked to see if he's the subject of

7           any restraining orders or protective orders.

8           It turns out that from 2009 until 2015 Mr.

9           Fernandez was the subject of 5 separate

10          restraining orders involving -- looks like

11          1, 2, 3 -- 4 different women.  Again, I have

12          no information that he violated any of those

13          restraining orders.  They all have expired

14          obviously over different periods of time but

15          --

16              THE COURT:  Were they all in

17          Springfield?

18              MR. LEAMING:  They were all in

19          Massachusetts.  It just lists the dates and

20          the identity of the victim or the person

21          from whom he's being restrained.  But it's

22          according to Massachusetts Department of

23          Corrections records, so I can't say that

24          they're Springfield, although that's where

25          he's from but I would assume that probably

```
 1                    from that area.
 2                        I recognize, your Honor, that with
 3                    respect to Mr. Fernandez's criminal history
 4                    it appears that all of the -- with the
 5                    exception of the one case he's on probation
 6                    for or supervision, I can't pretend to know
 7                    I understand how Massachusetts criminal
 8                    procedure works, but it appears that his
 9                    prior arrests have all been dismissed,
10                    although at the time he committed this
11                    offense it appears he's on supervision from
12                    Massachusetts as to how I read the Pretrial
13                    Services report.
14                        Apparently, and I presume others can
15                    speak to this more intelligent than I can,
16                    there was some sort of violation that's been
17                    I guess dismissed or whatever they did
18                    procedurally although he's still being
19                    actively -- well, not actively supervised
20                    because he's in jail, but I guess he's still
21                    under the court supervision of Massachusetts
22                    for is December 2016 drug offense.
23                        THE COURT:  Um-hum.
24                        MR. LEAMING:  But it is significant and
25                    the Government's view is that he was on
```

```
1              supervision at the time he committed this
2              offense.  So I think that's sort of the
3              relevant facts from the Government's
4              perspective.
5                   I understand he's got his principal
6              ties up in the Springfield area.  You know,
7              he's been in Hartford, he was sort of an
8              unknown for us at the beginning of the
9              investigation and that was largely because
10             he's not from here and we couldn't figure
11             out what his connection to Mr. Velez was but
12             it sounds like their relationship was sort
13             of a business relationship at least with
14             respect to narcotics.
15                  We do believe, your Honor, based upon
16             all of those facts and circumstances that
17             the proposed conditions cannot reasonably
18             ensure the safety of the community and the
19             Government would be persisting in its motion
20             for pretrial detention.
21                  THE COURT:  Thank you.
22                  Let me ask for the record if both sides
23             have seen the Pretrial Services report.
24                  MR. LEAMING:  I have reviewed it, your
25             Honor.
```

```
 1              MR. KAPPES:  I have, your Honor.

 2              THE COURT:  And have you reviewed it

 3         with your client?

 4              MR. KAPPES:  Not in its entirety today,

 5         your Honor, but previously when we were here

 6         initially.

 7              THE COURT:  All right.  So your

 8         client's seen it and you've been over it,

 9         you've discussed it with him.

10              MR. KAPPES:  Yes, your Honor.

11              THE COURT:  Are there any corrections,

12         modifications?

13              MR. KAPPES:  May I have a moment,

14         please?

15              THE COURT:  Sure.

16              (Pause.)

17              MR. KAPPES:  Yes, your Honor.

18              THE COURT:  Thank you.  You want to be

19         heard?

20              MR. KAPPES:  Please, your Honor.

21              If I can just go in reverse order from

22         what Attorney Leaming said, is I just

23         learned today about these protective orders

24         which were taken out, and I think Attorney

25         Leaming said there were no violations of any
```

1          of those protective orders, and I'm unaware

2          of how Massachusetts works but in

3          Connecticut the standard to get a protective

4          order is very, very low.  It's not beyond a

5          reasonable doubt or even preponderance of

6          the evidence.  So I don't think that is

7          evidence of any type of violence.

8               THE COURT:  So four different women

9          complained somehow about presumably fear of

10         Mr. Fernandez and wound up with these

11         protective orders, but you're saying I

12         shouldn't infer anything from that?

13              MR. KAPPES:  No, your Honor.  Maybe it

14         was too many phone calls, maybe too many

15         phone calls late at night.  We just don't

16         know the basis for them and I don't think

17         you can infer that there's some sort of

18         danger or violence associated with them.

19              May I continue, your Honor?

20              THE COURT:  Yes, please.

21              MR. KAPPES:  May I have a moment,

22         please?

23              THE COURT:  Yes.

24              (Pause.)

25              MR. KAPPES:  With regard to the line

1           sheets that Attorney Leaming mentioned, I

2           think Attorney Leaming mentioned that this

3           wire was up for or this investigation was

4           occurring over a grand period of time or a

5           long period of time, and that there was one

6           particular incident where these calls

7           occurred.  And a lot of what Attorney

8           Leaming said didn't pertain specifically to

9           Mr. Fernandez but all these other

10          individuals who were involved, "Capone,"

11          Velez and all these other individuals.  "Ill

12          Child."  Not Mr. Fernandez.

13               And I think that the Government said

14          that after these were intercepted it took

15          about a day, day and a half before they

16          arrested Mr. Amaral.  There's no evidence

17          from what the Government has said that Mr.

18          Fernandez actually did anything other than

19          talk over the telephone.  It sounded from

20          what Attorney Leaming said that these were

21          outbursts of Mr. Fernandez about, hey, how

22          come this guy is attacking my friend, how

23          come he's attacking my friend.  It didn't

24          say that he was actively going to go out and

25          commit any sort of act of violence against

```
1              him.  It was this expression of
2              dissatisfaction to a purported superior of
3              what had occurred.
4                   I believe that Attorney Leaming said
5              that the police were out looking for Mr.
6              Amaral and there's no -- if the police had
7              suspected or the Government had suspected
8              that Mr. Fernandez was actively involved
9              with some sort of retribution I would have
10             presumed that they would have acted upon
11             that and detained him.  But they didn't.
12                  THE COURT:  So let me just go back and
13             make sure I understand.
14                  You just said there's no actual threat
15             or discussion of any intention to inflect
16             violence shown in the line sheets?
17                  MR. KAPPES:  I can see how the
18             Government could interpret that.
19                  THE COURT:  Yeah.
20                  MR. KAPPES:  But aside from Mr.
21             Fernandez's statements of anger and, hey,
22             this isn't fair, what the heck is going on,
23             you know, that's my friend, you know.  If I
24             see this guy I'm going to address it with
25             him.  But there's no -- he's not saying I've
```

```
1              got a gun, I'm going to go shoot him.  He's
2              not saying -- there's nothing in those, in
3              those line sheets that we discussed that
4              show that type of plan.  Remember, the
5              police were out looking for this person.
6              They knew Mr. Fernandez; they didn't arrest
7              him, they didn't detain him.  So I think
8              that you have to put those line sheets in
9              context.
10                  THE COURT:  Okay.  Before we get away
11             from this, what's your response to that?
12                  MR. LEAMING:  So the actual words by
13             Mr. Fernandez were --
14                  THE COURT:  I do have a copy, and you
15             have a copy too I gather.
16                  MR. KAPPES:  I saw them this morning,
17             your Honor.
18                  THE COURT:  All right.  Do you want a
19             copy while we're going over the --
20                  MR. LEAMING:  I have another --
21                  THE COURT:  Okay.
22                  MR. LEAMING:  I have another copy.
23                  THE COURT:  Yeah.
24                  MR. LEAMING:  So it's on the first
25             page, it's about -- looks like 5 or 6 pages.
```

1          Mr. Fernandez says, "Ill," so tell

2     "Capone" if he with him in that car with him

3     we about to flare it the fuck up next time

4     he pull up." Which again we interpreted

5     that Mr. Fernandez is saying next time we

6     see him we're going to flare it up, meaning

7     we're going to shoot him.

8          Then there's a discussion between Velez

9     about who, he says "Ill," and he talks again

10    about pulling out on "Fox" and, "I'm banging

11    on him, that's my brother, I'm banging on

12    him." And then Mr. Velez goes ahead and

13    apparently authorizes him to go ahead and

14    bang on him.

15         So the Government views that as a

16    credible threat of violence against Mr.

17    Amaral when Mr. Fernandez sees Mr. Amaral

18    again.

19         In response to these calls agents in

20    the wire room notified Hartford Police that

21    there may be a potential for violence in the

22    area of Elliott Street.  So obviously we're

23    trying to balance two things; we don't want

24    to compromise the existence of the wire and

25    we obviously can't allow violence to occur.

1        So they send in a bunch of police officers

2        in the area to sort of dissuade anybody from

3        taking any violence, which is our experience

4        typically works.  No one is going to try to

5        get into a gun battle when there's police

6        car officers sitting at a corner.

7            So, but again this is all happening

8        after 11:00 at night.  And so the next

9        morning we went and got state warrants for

10       Mr. Amaral and arrested him that day, which

11       was the day after.

12            THE COURT:  Okay.  All right.  Thank

13       you.

14            Go ahead, Mr. Kappes.

15            MR. KAPPES:  Yes, your Honor.

16            And aside from these two brief calls I

17       don't think there was any other

18       communication or at least we haven't been

19       provided any other communication directly

20       from Mr. Fernandez to anybody regarding this

21       particular situation.  I think that Attorney

22       Leaming said there were a number of

23       different wiretaps.  They had several

24       different phones of the Latin Kinds during

25       this time and there's no other evidence of

1        specific harm or threats as a result of this

2        incident from Mr. Fernandez.

3            If I might just have a moment, your

4        Honor.

5            THE COURT:  Um-hum.

6            (Pause.)

7            MR. KAPPES:  Your Honor, turning to the

8        indictment Mr. Fernandez is not facing any

9        type of mandatory minimums.  He's charged in

10       a (b)(1)(C) and there are two counts against

11       him.  One is the overall conspiracy and the

12       other is a specific date on which I think

13       Attorney Leaming indicated that he allegedly

14       transferred some bags to a purchaser for Mr.

15       Velez.

16           With regard to -- if we look at the

17       Pretrial Services report, your Honor, there

18       have been no convictions of Mr. Fernandez.

19       And I had the opportunity to speak to the

20       Massachusetts Probation Officer and she

21       described to me that if there's an arrest in

22       Massachusetts and it's not of a particular

23       nature, it's of a lower nature, they have a

24       diversionary track where there's no finding

25       of guilt or innocence, you're put on a

1          period of probation and if you complete that

2          probation the charges are dismissed.  I

3          can't say it's an official diversionary

4          program like we have in Connecticut for AR

5          or something to that effect, but it's --

6          basically it follows an arrest.  As I said,

7          there have been no convictions of Mr.

8          Fernandez.

9               The proposal that we've put in place --

10              THE COURT:  What was the charge that

11         led to his being on probation?

12              MR. KAPPES:  I believe it was

13         narcotics, your Honor.  I believe that's

14         page 4, at the top of page 4 of the Pretrial

15         Services report.

16              THE COURT:  Um-hum.  It's the

17         12/17/2016.  Yes.

18              MR. KAPPES:  Yes, your Honor.

19              THE COURT:  I see that.  Okay.  Thank

20         you.  Go ahead.

21              MR. KAPPES:  Yes, your Honor.

22              The proposal that we've put forth, your

23         Honor, would be for Mr. Fernandez to be

24         released to the custody of his mother who is

25         present.  She would act as a third-party

1     custodian.  And Mr. Fernandez's residence

2     would be in Massachusetts, Springfield,

3     Massachusetts.  Attorney Leaming said the

4     incidents in this complaint or this

5     indictment rather, are all centered on the

6     South End of Hartford around Elliott Street.

7     We would be removing Mr. Fernandez from that

8     trouble spot, from all the problems

9     associated with there and putting him in a

10    more secure location.

11          As I indicated, his mother would act as

12    a third-party custodian.  If there's some

13    type of GPS or home confinement that's

14    necessary we're more than willing to

15    accommodate that.

16          If your Honor were to release him he

17    would then be subject to three different

18    levels of scrutiny and supervision.  He has

19    to report to his Massachusetts Probation,

20    which I might add he's been in successful

21    compliance with everything that they've

22    asked of him during the period of his

23    probation.  The United States Probation

24    Office of Massachusetts would be supervising

25    him.  Most importantly his mother would be

1          supervising him, ensuring that he gets the

2          mental health treatment that he needs.  I

3          believe she's also arranged a job for him if

4          your Honor were to release him.

5               Mr. Fernandez has never had a passport.

6          He's never traveled outside of the U.S. and

7          in the U.S. he's only traveled to New York,

8          Massachusetts and Connecticut.

9               Based upon the foregoing, your Honor,

10         we're respectfully requesting Mr.

11         Fernandez's release.

12              THE COURT:  I understand his mother is

13         ill.

14              MR. KAPPES:  Yes, your Honor.

15              THE COURT:  Is there anything you want

16         to tell me about that?

17              MR. KAPPES:  Well, your Honor, I don't

18         believe it's to the -- if I may, she can

19         certainly address the Court if necessary,

20         but I don't think there's anything

21         debilitating to the effect that it would

22         impact her ability to supervise Mr.

23         Fernandez.  She's currently working I

24         believe full time still, so it hasn't

25         interfered with that.

```
 1                    THE COURT:  Would you like to come up,

 2            ma'am?  Okay.  Just come right up here to

 3            the podium.

 4                    So you're Carmen Solas?

 5                    MS. SOLAS:  Yes, I am.

 6                    THE COURT:  And this is your son.

 7                    MS. SOLAS:  Yes.

 8                    THE COURT:  And you live in

 9            Springfield?

10                    MS. SOLAS:  Yes.

11                    THE COURT:  How long have you lived at

12            your residence?

13                    MS. SOLAS:  15 years.

14                    THE COURT:  And do you own it or rent

15            it?

16                    MS. SOLAS:  I own it.  And I work for

17            the City of Springfield at the school

18            department.

19                    THE COURT:  What kind of a house it is?

20            Is it a multi-family, single-family?

21                    MS. SOLAS:  A one single-family home.

22                    THE COURT:  Single-family.  When was

23            the last time your son lived there?

24                    MS. SOLAS:  He's been living with me.

25                    THE COURT:  He's been living with you?
```

```
 1                    MS. SOLAS:  Yeah.

 2                    THE COURT:  During this whole time?

 3                    MS. SOLAS:  Yes.

 4                    THE COURT:  He wasn't living with the

 5              mother of his child?

 6                    MS. SOLAS:  He would visit his children

 7              there.  He would go there to visit his

 8              children.

 9                    THE COURT:  He would visit.

10                    MS. SOLAS:  Yeah.

11                    THE COURT:  Was he working?

12                    MS. SOLAS:  He would get work under the

13              table.

14                    THE COURT:  How often?

15                    MS. SOLAS:  Well, it's enough.

16              (Unintelligible) like in the 3 months to 6

17              months out of the year.  It's in a farm in

18              Agawam.

19                    THE COURT:  So you've owned the house

20              for 15 years?

21                    MS. SOLAS:  Yes.

22                    THE COURT:  Who else lives there?

23                    MS. SOLAS:  My husband, Isiah Lawless

24              (phonetic).

25                    THE COURT:  I'm sorry?
```

```
 1                 MS. SOLAS:  His name is Isiah Lawless.

 2                 THE COURT:  Okay.  And does your

 3            husband work?

 4                 MS. SOLAS:  He's a retired military, 35

 5            years' service he did.

 6                 THE COURT:  How long have you and he

 7            been married?

 8                 MS. SOLAS:  20 -- well, we've been

 9            together 20 years.  We just got married 4

10            years ago.

11                 THE COURT:  Just the two of you in the

12            house?

13                 MS. SOLAS:  My 17-year-old, his son.  I

14            have a son from him, 17 years old.  And I

15            also have Cruz's 9-year-old son.

16                 THE COURT:  So it's you, your husband,

17            the son you have together and the

18            Defendant's 9-year-old son.

19                 MS. SOLAS:  Yes, that's correct.

20                 THE COURT:  And you're saying he was

21            with you during this entire time period

22            we've been talking about.

23                 MS. SOLAS:  Yes.

24                 THE COURT:  Living there every day.

25                 MS. SOLAS:  Living there, and he go
```

1                 visit his kid's mother, Connecticut.

2                     THE COURT:  Visit for weeks at a time,

3                 days at a time?

4                     MS. SOLAS:  One day.

5                     THE COURT:  A day.

6                     Now, where do you work, ma'am?

7                     MS. SOLAS:  For the City of Springfield

8                 school department.  Been doing that for 20

9                 years with disability children.

10                     THE COURT:  And what do you do?

11                     MS. SOLAS:  I'm a paraprofessional.

12                     THE COURT:  You're a para?  In a

13                 classroom?

14                     MS. SOLAS:  Yes.

15                     THE COURT:  So what are your work

16                 hours?

17                     MS. SOLAS:  Right now I'm with children

18                 from 18 to 22 in a store, in a Saver store

19                 --

20                     THE COURT:  Uh-huh.

21                     MS. SOLAS:  -- showing them now to

22                 perform duties and keeping a job, how to

23                 maintain a job so when they're 22 years old

24                 they'd be able to get successful jobs.

25                     THE COURT:  And where is that you said

```
 1              you got your son a job?

 2                   MS. SOLAS:  At Saver's.

 3                   THE COURT:  That same place where you

 4              work?

 5                   MS. SOLAS:  Yes.

 6                   THE COURT:  So what are your work

 7              hours?

 8                   MS. SOLAS:  7:20 to 2:20, but I'm home

 9              most of the summer.  As of yesterday school

10              ended for me, so I'm home all summer.  I'm

11              planning on having surgery because I have --

12                   THE COURT:  Yes.  I wanted to ask you

13              about that.  I'm sorry to read that you're

14              ill.

15                   MS. SOLAS:  Yes.  I have cancer.

16                   THE COURT:  Yes, I saw that.

17                   MS. SOLAS:  I've been fighting that for

18              a while and I'm due for surgery soon.

19                   THE COURT:  All right.  Do you have it

20              scheduled?

21                   MS. SOLAS:  For July 6, and I'm going

22              in --

23                   THE COURT:  July 6th.  Okay.  That's

24              pretty serious surgery, isn't it?

25                   MS. SOLAS:  Yes.
```

```
1            THE COURT:  I know it is.  Are you
2       going to be in the hospital for a while?
3            MS. SOLAS:  Three days, at least three
4       days I'll be there.
5            THE COURT:  And who is going to take
6       care of you when you come home?
7            MS. SOLAS:  I'm hoping my husband and
8       my other son, and if Cruz is home that way
9       he'll be with his 9-year-old son that's with
10      me.
11           THE COURT:  Okay.
12           Now, what do you understand about
13      signing a bond?
14           MS. SOLAS:  I'm responsible for him to
15      appear any court day he has.  If he ever
16      have any trouble, any problems, anything, I
17      know who to call.
18           THE COURT:  Um-hum.  And you know if he
19      didn't show up they could take your house.
20           MS. SOLAS:  That's fine.  Yep.
21           THE COURT:  You know that?
22           MS. SOLAS:  I'm aware of it, yeah.  I'm
23      confident my son will show up to his court
24      appearance.  That wouldn't happen.  I'm
25      aware they can take my house but...
```

```
 1                    THE COURT:  You heard about all these
 2          allegations of drug dealing and violence?
 3                    MS. SOLAS:  Yes.
 4                    THE COURT:  That concern you?
 5                    MS. SOLAS:  Yeah.  In shock more like,
 6          okay?
 7                    THE COURT:  Um-hum.  Okay.
 8                    Any questions either counsel would have
 9          me ask of the Defendant's mother?
10                    MR. LEAMING:  Not from the Government,
11          your Honor.
12                    THE COURT:  Sir?
13                    MR. KAPPES:  No, your Honor.
14                    THE COURT:  All right.  Thank you,
15          ma'am.  Good luck with your surgery.
16                    MS. SOLAS:  Thank you.
17                    THE COURT:  Either --
18                    MR. KAPPES:  May I have a moment?
19                    THE COURT:  Sure.
20                    (Pause.)
21                    MR. KAPPES:  Thank you, your Honor.
22                    THE COURT:  Other --
23                    MR. LEAMING:  Just a couple points,
24          your Honor.  With respect to Ms. Solas'
25          representations about where Mr. Fernandez is
```

```
 1          living, I just don't think that's accurate
 2          at all.
 3               THE COURT:  All right.  Tell me why.
 4               MR. LEAMING:  Well, one, I believe that
 5          Mr. Fernandez said he was living on Elliott
 6          Street, that's one, for a period of time, I
 7          think of up to two years.  Even if he was
 8          living up there I'm not sure what that says
 9          if he's coming down to Hartford every day as
10          to the suitability of supervision he would
11          get up in Massachusetts.
12               So if Ms. Solas' recollection is
13          correct he's living there every day and just
14          coming down during the day every day, I mean
15          what's to sort of stop him from doing that
16          again.  But I think it is in direct conflict
17          with what even Mr. Fernandez reported as far
18          as where he was living.  So I would just
19          point that out, your Honor.
20               Other than that, the Government doesn't
21          have anything else.
22               THE COURT:  All right.
23               MR. KAPPES:  Your Honor, Mr. Fernandez
24          did indicate that he was saying down here
25          for substantially longer periods of time
```

1          than Ms. Solas had indicated where he would

2          come down for I think it was weeks and

3          months at a time to be with his child here.

4               Thank you, your Honor.

5               THE COURT:  So, Mr. Leaming, Defense

6          counsel proposed house arrest, the argument

7          being that that would stop him from coming

8          down here.

9               MR. LEAMING:  Well, certainly, your

10         Honor, to the extent that the Court would be

11         considering any conditions of his release we

12         would have asked ordinarily that would be a

13         better place for him typically than coming

14         back to the location where the criminal

15         activity occurred.  However, I do note that

16         his criminal activity before he moved to

17         Connecticut obviously occurred in

18         Springfield.  And I know he's never been

19         convicted of offense, he's been arrested

20         multiple times, he's been the subject of

21         protective orders up there, which while

22         again I can't make any representations as to

23         the facts and circumstances of it, but I

24         mean it's pretty compelling that 5

25         restraining orders, 4 different women over a

```
1              period of 6 years tells me something.

2                   But I mean I guess what my concern

3              would be is, you know, it's not under lock

4              and key.  He could decide one day that I

5              don't want to do this anymore and leave.

6                   Now, obviously Probation gets alerted

7              and the GPS goes off, he removes the GPS

8              bracelet and, you know, we're off to find

9              him.  So I recognize in the scale of

10             restrictions it's the most restrictive sort

11             of incapacitation that we have but, you

12             know, given the nature of the criminal

13             activity and his involvement which I believe

14             to be a lot more than just talking about

15             violence, the Government does not believe

16             that would be sufficient.

17                  THE COURT:  How would you describe the

18             intercepts involving this Defendant over the

19             so-called drug phone?  Well, let me ask you

20             this first.

21                  MR. LEAMING:  Sure.

22                  THE COURT:  You heard Defense counsel

23             argue that the only intercepts concerning

24             the Defendant linking him to violence was

25             this one set of line sheets you pointed us
```

1     to.

2       MR. LEAMING:  So --

3       THE COURT:  So I want you to respond to

4     that, but then I want to have some

5     understanding of what the rest of the

6     wiretap shows.

7       MR. LEAMING:  Okay.  So as I indicated

8     at the beginning we initially intercepted

9     Mr. Velez's Latin King phone beginning I

10    think it was about August 18th.  There's some

11    drug talk on that but not a lot.  He did

12    talk to some people in his inner circle

13    about some drug activity, but it became

14    pretty clear that he had a different phone

15    on which he was engaging in narcotics

16    activity.

17     I believe it was September 12th that we

18    received authorization to go to the drug

19    phone.  We also renewed the Latin King phone

20    so we were simultaneously listening to both

21    Mr. Velez's phones.  So two days after we

22    started intercepting Mr. Velez's drug phone

23    was this incident.

24     I believe it was the following day --

25    I'd have to go back and look -- but Mr.

1    Velez got sort of lucky.  There was a

2    separate DEA investigation that had been

3    targeting a couple Latin King members in New

4    Britain, and that case had resulted in a

5    number of arrests, including some gentlemen

6    from New Britain.

7      While we were listening to Mr. Velez's

8    drug phone Mr. Velez gets a call from his

9    cousin Angel Velez.  Angel we've identified

10   already in the few days that we were up on

11   this phone appeared to be a cocaine source

12   for Mr. -- Angel appeared to be a cocaine

13   source for Wilson Velez.  But Angel calls

14   Wilson Velez and says you got to drop your

15   phone.  There was a lot of discussion about

16   the feds and some arrests, and over the

17   course of the next several days Wilson Velez

18   reaches out to all of the people in his

19   circle to tell them that he's going to get a

20   new phone and that they should get new

21   phones.  And after that period of a few days

22   Mr. Velez drops his phone.

23    So I would say in total we had maybe 7

24   to 8 days of meaningful intercepts on Mr.

25   Velez's drug phone.

1          From there we essentially spent the

2     next two months chasing Mr. Velez's phone.

3     We got roving authority, we ultimately

4     listened to 4 different phones in 30 days

5     because he kept dropping and picking up a

6     new phone.  And by then Mr. Velez was so

7     paranoid about the potential for his arrest

8     the quality of the intercepts, the nature of

9     the discussions he was having were not the

10    same as the first 7 or 8 days that we were

11    up on his drug phone before he was tipped

12    off.

13          As it turned out we were in fact

14    listening to his phone but he thought for a

15    different -- you know, he sort of figured it

16    out in a different way, so unfortunately for

17    us it created a lot of obstacles for us.

18          So Mr. Kappes is largely correct in the

19    sense of there isn't a whole lot more

20    because Mr. Velez dropped his phone and kept

21    chasing -- and every time we were lagging

22    behind his phone so we were never -- you

23    know, he did have other drug calls, we did

24    get other evidence, we did execute search

25    warrants.  We did find Mr. Velez's stash

```
 1              house.  So all of those things we were still
 2              able to obtain through the course of the
 3              investigation.  But this isn't a case where
 4              I can say we listened to Mr. Velez's sort of
 5              uninterrupted phone calls for 60 or 90 days
 6              and Mr., you know, Fernandez is on it every
 7              other day buying whatever.  That's not sort
 8              of how he operated.
 9                   THE COURT:  What did you identify as a
10              stash house?
11                   MR. LEAMING:  So he had a stash house
12              at 810 Hamilton Street, also in the South
13              End.  We found out subsequent to the
14              execution of that search warrant from
15              another cooperator that Mr. -- but we missed
16              a large quantity of narcotics including
17              about a kilo of heroin and a half a kilo of
18              fentanyl.  We also found out that Mr. Velez
19              had 8 firearms that we missed.  We've
20              subsequently recovered them but -- and we
21              subsequently recovered the drugs but, you
22              know, Mr. Velez was a shrewd operator in his
23              narcotics activity.
24                   So, you know, I can't obviously dispute
25              that -- the evidence is what the evidence
```

```
 1              is, but it doesn't -- in the Government's
 2              view it doesn't mean that that was the limit
 3              of Mr. Fernandez's criminal activity.
 4                   THE COURT:  So let's go back to the
 5              time when the phone was active.  How much do
 6              you pick up about Mr. Fernandez?
 7                   MR. LEAMING:  So they talk as I
 8              indicated.  So things start happening
 9              quickly once that tip -- after Mr. Velez
10              says he's going to get a new phone.  And so
11              meanwhile the FBI did have a confidential
12              source who had been purchasing drugs from
13              Mr. Velez over the course of the
14              investigation, and he's telling the source
15              don't call me on this phone, I'll call you
16              back when I get a new phone.
17                   Well, we also simultaneously had fixed
18              surveillance cameras in the area of
19              Wethersfield Avenue and Elliott Street and
20              so we were able to sort of monitor the
21              activity.  So at one point on the -- so now
22              this is September 16, so all of this is
23              happening within a couple of days.
24                   THE COURT:  Um-hum.
25                   MR. LEAMING:  Like the phones are going
```

 1          to get dropped.  Even when Mr. Velez is

 2          talking to anybody he's super careful.  He's

 3          like I'm not talking about anything --

 4               THE COURT:  Um-hum.

 5               MR. LEAMING:  -- that's overtly

 6          criminal.

 7               So on the 16th we sent the confidential

 8          source up to Elliott Street because we know

 9          that Velez is up there to see like, hey,

10          hey, what's going on?  You get a new phone

11          number because -- we can't get the new phone

12          number.  And it was during that transaction

13          where ultimately the source says he wants to

14          buy 500 bags from Velez and that's when he

15          directs Mr. Fernandez to go to Elliott

16          Street and bring it out.

17               So that's on September 16th.  By

18          September 18th and 19th the phone is pretty

19          much done.

20               THE COURT:  Um-hum.  So my question was

21          what's the other information about this

22          Defendant?

23               MR. LEAMING:  About his ongoing

24          criminal activity?  From other confidential

25          sources and other information that we

```
1              obtained which I would deem to be highly
2              reliable, is that Mr. Fernandez was a street
3              level dealer.  He came down to Elliott
4              Street and he started selling quantities of
5              cocaine and heroin and over time came to
6              know Mr. Velez and started buying drugs from
7              him.
8                   So, you know, that's sort of what he
9              is.  He's a street level drug dealer who was
10             working for it just so happened to be a high
11             ranking Latin King.
12                  So like I said, I recognize he had a
13             business relationship but he's not a Latin
14             King and didn't participate in any sort of
15             organized Latin King activity, but Mr. Velez
16             has employed other non-Latin Kings also to
17             sell drugs in that area and other locations.
18                  Mr. Velez would use family members, for
19             example, he employed a juvenile to run the
20             staff house on Hamilton Street.  He would
21             serve customers, he would bag up heroin.  He
22             used an 18-year-old nephew to do the same
23             thing.  So why I say he's a shrewd operator,
24             Mr. Velez recognizes by including his nephew
25             he's less likely to have that person turn on
```

1     him, especially and 18-year-old.  He's using

2     a juvenile to actually maintain the stash

3     house.  His foster father is actually the

4     superintendent of the stash house with whom

5     he had a -- you know, when he was a juvenile

6     he was raised by this man.  So again, he

7     kept his inner circle close to him.

8          And so -- but of course to get his

9     drugs on the street he had to expand that

10    circle, but again even Mr. Fernandez wasn't

11    sort of an intimate member of Mr. Velez's

12    operation because Mr. Velez wouldn't have

13    let somebody like that get that close to

14    him.

15         THE COURT:  Um-hum.

16         MR. LEAMING:  So, you know, if I were

17    to characterize it, as I stated that Mr.

18    Fernandez was a street level dealer, he had

19    been operating in that area probably since

20    he came there or shortly thereafter.

21         The violence, you know, like I said at

22    the beginning, we didn't know who he was.

23    He wasn't sort of a known commodity in that

24    location until we started investigating Mr.

25    Velez and started focusing our attention on

```
 1              Elliott Street where we'd see Mr. Fernandez
 2              and other people sort of hanging out
 3              typically doing what they're doing, which is
 4              they get a lot of drive-up customers in that
 5              area.  It was sort of known, you know, for
 6              out-of-town customers to go to that area.
 7              You get served with heroin or cocaine or
 8              crack, and him and a number of others that's
 9              that they would do.
10                   THE COURT:  Um-hum.
11                   MR. LEAMING:  So --
12                   THE COURT:  Is Mr. Velez detained?
13                   MR. LEAMING:  He's in jail, yes, your
14              Honor.
15                   THE COURT:  All right.  Anything else?
16                   MR. LEAMING:  Not from the Government,
17              your Honor.
18                   MR. KAPPES:  No, your Honor.
19                   THE COURT:  Give me a few minutes.
20                   (Pause.)
21                   THE COURT:  What did you tell me, Mr.
22              Leaming, about the information as to this
23              Defendant's whereabouts during the course of
24              the wire?  I mean was he seen daily on
25              surveillance?  What's the nature of that --
```

1           MR. LEAMING:  He was seen on a regular

2      basis hanging out on that -- in front of the

3      22 Elliott Street, the apartment building

4      there.

5           THE COURT:  Okay.

6           (Pause.)

7           THE COURT:  All right.  I've reviewed

8      all the material before me, the Pretrial

9      Services report.  I've had a discussion with

10     the Probation Officer who is present in the

11     courtroom.  I've listened carefully to the

12     thorough arguments of both counsel and I'm

13     prepared to rule.

14          I hold that the Government has shown by

15     clear and convincing evidence that the

16     Defendant is a danger to the community and I

17     hold him in pretrial detention on those

18     grounds and make the following findings of

19     fact.

20          With regard to the nature and

21     circumstances of the offense charged, I find

22     that the offense charged is a drug

23     conspiracy with indications of violence but

24     primarily of course a drug conspiracy.

25          The weight of the evidence against the

1          Defendant appears to me to be very strong.

2          Very strong.  I mean there's wiretap

3          evidence, there's a buy, you know, all of

4          the evidence that normally accompanies that

5          kind of situation.

6               With regard to his history and

7          characteristics the Defendant presents as

8          being in good physical condition.  He's a

9          27-year-old man.  He's primarily from

10         Springfield.  He has children; he's got a

11         child in Springfield who is living with his

12         mother, not the child's mother, the

13         Defendant's mother.  And then he's got two

14         more children with his significant other who

15         I think is also here in court; is that

16         right?

17              MR. KAPPES:  Yes, your Honor.

18              THE COURT:  Yes.

19              Except for this, you know, sporadic --

20         what his mother reports as sporadic

21         employment and this under the table

22         unverifiable work for this Mike & Mike

23         business that's discussed the Pretrial

24         Services report there's no history other

25         than that of employment.  So his financial

1        resources from legitimate sources are very

2        limited.

3            He has the -- I infer that he has the

4        community ties that one would have living in

5        Springfield for the time that he was.  His

6        Pretrial Services report indicates that he

7        moved back and forth between the Bronx and

8        Springfield and lived with his mother for

9        four years while in school.  If released of

10       course his mother proposes to take him into

11       her custody and I'll go back to that in a

12       moment.

13           He has a history of drug and alcohol

14       use and abuse.  He reports social

15       consumption of alcohol beginning at age 13.

16       He also reported a history and current use

17       of marijuana which he's been using since he

18       was 11 years old and uses it on a daily

19       basis.

20           Both counsel are correct in their

21       characterization of the Defendant's criminal

22       history which is set forth in the Pretrial

23       Services report.  He presently is on

24       probation in Massachusetts and was on

25       probation at the time that the crimes

1              charged were committed.

2                   I don't see his mother as being an

3              appropriate custodian.  She obviously cares

4              for her son.  I don't doubt that.  She has a

5              serious illness; she's scheduled for serious

6              surgery.  These crimes were committed during

7              a time when at least she says he was under

8              her supervision, so I can't see how that

9              will work out terribly well.

10                  And more to the point we have evidence

11             that he was here in Hartford participating

12             in this drug conspiracy, in the words of the

13             Government "hanging out" on Elliott Street

14             where drugs were being sold on the street by

15             the Defendant and other people.  That's

16             inconsistent with the information his mother

17             reports.  His mother claims he was there in

18             Springfield all the time living there and,

19             you know, would come down for a day and

20             visit his children.  And even the Defendant

21             doesn't agree with that characterization.

22                  So for that collection of reasons I

23             don't see that the proposal that his mother

24             supervise him is an adequate and appropriate

25             proposal.

1            He's got this history of let's say

2        trouble in Massachusetts.  We've heard about

3        the number of protective orders from a

4        number of different women over -- madam, I

5        don't want to hear from you.  I don't want

6        to hear from people sitting out there.

7            He's got a history of protective

8        orders, a number of protective orders from a

9        number of different women.  Defense counsel

10       properly argues that we don't know the

11       circumstances of those, but the fact is they

12       do exist, they were court orders and they're

13       part of the record here.

14           What concerns me most of all are the

15       wiretapped conversations that we've heard

16       the Government go through and we've all

17       listened to very carefully involving very

18       serious threats of violence against a

19       person.  Those are not people talking about

20       the Defendant; those are the Defendant's own

21       words, those are the Defendant's own words

22       the Defendant himself is talking about

23       inflicting violence on another individual.

24           So I think I have mentioned everything

25       that I wanted to mention.

```
 1              MR. KAPPES:  Your Honor, may I have a
 2        moment please?
 3              THE COURT:  Yes.  I forget to mention
 4        one thing, that with regard to commenting
 5        upon the Defendant's health I do see and did
 6        consider the Defendant's report of past
 7        mental health issues.  So I did note that, I
 8        saw it when I reviewed the Pretrial Services
 9        report.  I actually discussed it with the
10        Probation Officer.  It is of course a
11        concern to me.  I just want the record to be
12        clear I did not overlook it.
13              Yes, sir.
14              MR. KAPPES:  May I have moment, your
15        Honor?
16              THE COURT:  Of course.
17              (Pause.)
18              MR. KAPPES:  May I have another moment?
19              THE COURT:  Yes.
20              (Pause.)
21              MR. KAPPES:  Thank you, your Honor.
22              THE COURT:  All right.  Anything
23        further from either counsel?
24              MR. LEAMING:  Not from the Government,
25        your Honor.
```

```
 1              MR. KAPPES:  No, your Honor.

 2              THE COURT:  All right.  I want to thank

 3         both counsel.  Both counsel have made very

 4         careful and thorough and appropriate

 5         arguments and I've listened to them

 6         carefully.  So I thank you both.

 7              And it's of course very important, Mr.

 8         -- is it Mr. Cruz or Mr. Fernandez?

 9              MR. KAPPES:  Fernandez, your Honor.

10              THE COURT:  It's Cruz?

11              THE DEFENDANT:  My first name is Cruz.

12              THE COURT:  Your first name is Cruz.

13         All right.  Thank you.

14              So, Mr. Fernandez, your lawyer made

15         good strong arguments on your behalf and I

16         very carefully listened to him and

17         considered everything that he said on your

18         behalf, but I've made my ruling.

19              We're in recess.

20              (Proceedings concluded at 12:46 p.m.)

21

22

23

24

25
```

```
1                          CERTIFICATE

2

3              I hereby certify that the foregoing 59

4    pages are a complete and accurate transcription to the

5    best of my ability of the electronic recording of the

6    Detention Hearing in re:   UNITED STATES OF AMERICA vs.

7    CRUZ FERNANDEZ, Criminal No. 3:18-CR-00090 JAM-6, held

8    before The Hon. Donna F. Martinez, United States

9    Magistrate Judge, in Hartford, Connecticut, on June

10   20, 2018.

11


12   _____

13   Suzanne Benoit, Transcriber            Date: 7/21/18

14

15

16

17

18

19

20

21

22

23
```