UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :  No. 3:18CR90(JAM)
                                 :
          v.                     :
                                 :
CRUZ FERNANDEZ,                  :
                                 :  New Haven, Connecticut
                 Defendant       :  September 23, 2019
                                 :
- - - - - - - - - - - - - - - - x
```

SENTENCING


        BEFORE:

            THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.



A P P E A R A N C E S :


        FOR THE GOVERNMENT:

                OFFICE OF THE UNITED STATES ATTORNEY
                    450 Main Street
                    Hartford, Connecticut 06103
                BY:  BRIAN P. LEAMING, AUSA


        FOR THE DEFENDANT:

                SILVESTER & DALY
                    300 State St., Suite 506
                    New London, Connecticut 06320
                BY:  ROBERT F. KAPPES, ESQ.



                                Diana Huntington, RDR, CRR
                                Official Court Reporter

1                        **1:06 P.M.**

2              THE COURT:  We're here today for sentencing in

3    the matter of United States of America v. Cruz Fernandez.

4              Appearance of counsel, please, for government.

5              MR. LEAMING:  Brian Leaming on behalf of the

6    United States.

7              MR. KAPPES:  Good afternoon, Your Honor.  Robert

8    Kappes for Mr. Fernandez who is seated to my left.

9              THE COURT:  Mr. Fernandez, are you doing okay

10   today, sir?

11             THE DEFENDANT:  Yes.  And yourself?

12             THE COURT:  It looks like you have some family

13   members here.

14             THE DEFENDANT:  Yes.

15             THE COURT:  Who is here?

16             THE DEFENDANT:  My sister, my brother, my

17   fiancée, my mom, her mom, and my two kids.

18             THE COURT:  Welcome to all of them.

19             On February 26, 2019, Mr. Fernandez appeared

20   before the Court for purposes of entry of a plea of guilty

21   to a charge of conspiracy to possess with intent to

22   distribute heroin and fentanyl.

23             A Presentence Report has been prepared by our

24   probation officer, Ms. Victoria Aguilar, who is here in

25   the courtroom.  Thank you for your work on the Presentence

1    Report, Ms. Aguilar.

2                I wanted to review with you, Mr. Fernandez, what

3    I'm going to cover or review during today's sentencing

4    hearing.

5                The first thing I'm going to do is go over some

6    pretty technical matters mostly with the lawyers, a little

7    bit with you.

8                After that, Mr. Kappes will have an opportunity

9    to make some remarks on your behalf.  And then you're

10   welcome, if you'd like, to make any kind of statement you

11   wish.  Or if you wish any of your family members or

12   supporters to make any statement, they're welcome to do

13   so.  I've just received this morning a couple of letters

14   from supporters of yours.

15               After that, I'll hear from Mr. Leaming.

16               And then, of course, Mr. Kappes, if you have

17   anything to say in response before I turn to the

18   imposition of sentence.

19               So in terms of what I've looked at, I've looked

20   at all the documents on the docket in the case which, of

21   course, principally include the parties' plea agreement,

22   the charge, the Presentence Report along with financial

23   statement.  There's an addendum to the Presentence Report

24   because I know Mr. Kappes had some objections he lodged.

25   And then there's the parties' respective sentencing

1    memoranda.

2           And then this morning I received from the

3    Probation Office the letter from the -- there are three

4    documents.  One was a letter from Mr. Santiago, Director

5    of Security at the DOC, stating in substance that

6    Mr. Fernandez had renounced his affiliation with the

7    Bloods and that he was now on inactive status with respect

8    to that program.  Then I've received also two very

9    complimentary letters about Mr. Fernandez from Andrea

10   Walker and Ms. Christina Solis.

11          Is there anything else the parties think I

12   should have reviewed?

13          MR. LEAMING:  I don't believe so, Your Honor.

14          MR. KAPPES:  No, Your Honor.

15          THE COURT:  Okay.

16          And Mr. Fernandez, have you read the Presentence

17   Report and also the addendum to the Presentence Report?

18          MR. KAPPES:  Your Honor, if you may remember

19   from when Mr. Fernandez entered his plea, he has

20   difficulty reading the English language, so I read it to

21   him.

22          THE COURT:  All right.

23          Is that true, Mr. Fernandez?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  All right.  And I take it when you

1    had it read to you, did you discuss the content with your

2    counsel, sir?

3              THE DEFENDANT:  Yes.

4              THE COURT:  At this point are there any factual

5    objections remaining to the Presentence Report?

6              MR. KAPPES:  Your Honor, in my objections there

7    were a number of -- in the Criminal History section there

8    were a number of incidents where Mr. Fernandez was

9    involved with law enforcement and there were some factual

10   disputes as to the level of his involvement or the level

11   of threats or violence that he was involved in.

12   Specifically, Your Honor, I believe it was Paragraphs 46,

13   51, 53, 54, and 55.

14             THE COURT:  Okay.

15             MR. KAPPES:  Those were the objections I sent

16   along to Ms. Aguilar.

17             THE COURT:  Yes.  I'm looking at your

18   objections.

19             So as to Paragraph 46, it states simply that

20   Mr. Fernandez had never admitted to the officers that he

21   had been drinking alcohol, right?

22             MR. KAPPES:  That's correct, Your Honor.

23             THE COURT:  Otherwise he was in this car going

24   over 100 miles an hour basically fleeing from the police;

25   is that right?

```
 1              MR. KAPPES:  Yes, Your Honor.

 2              As to Paragraph 51, Mr. Fernandez stated that

 3   all of the charges were dismissed.

 4              And then I think the bulk of his objections were

 5   really 53 through 55.

 6              THE COURT:  I think the Presentence Report -- so

 7   as to 46, it wouldn't make a difference to the Court's

 8   evaluation of that incident whether or not he had been

 9   drinking then.

10              MR. KAPPES:  Correct, Your Honor.  I don't think

11   that the objections bear on any of the guidelines

12   calculations or anything to that effect.  It was more

13   there was some statements made I believe in the

14   government's sentencing memorandum as to Mr. Fernandez

15   being a violent person.  And those objections go to

16   whether or not that's accurate.  And Mr. Fernandez

17   obviously says that he was not a violent person.

18              THE COURT:  Okay.

19              Now, there's a portion in which he's -- is that

20   right, Mr. Leaming? -- on the wiretap?

21              MR. LEAMING:  Yes, Your Honor.

22              THE COURT:  In which he's --

23              MR. KAPPES:  With Mr. Amaral.

24              THE COURT:  He tells Velez -- this is from

25   Paragraph 20 -- "I'm done with this nigga, we taking care
```

1    of this nigga rat problems."

2              MR. KAPPES:  That's correct, Your Honor.

3              THE COURT:  "So tell Capone ... if he with him

4    that car with him ... We about to flare it the fuck up

5    next time he pull up" and he'll be "banging on him."

6              MR. KAPPES:  Those statements were made,

7    correct.

8              THE COURT:  Should I draw an inference one way

9    or the other as to whether he's a violent person from

10   those statements?

11             MR. KAPPES:  I don't think so, Your Honor.  As

12   indicated earlier in my objections, Mr. Fernandez denied

13   that he was going to shoot at Mr. Amaral.  He was angry

14   and in the heat of the moment, he made those statements.

15             So I think Your Honor can conclude that he was

16   angry and that he's an angry person at that point in time,

17   but whether or not he's a violent person, I would suggest

18   you not go that far.

19             THE COURT:  I see.

20             But you're not disputing those statements were

21   made.

22             MR. KAPPES:  I am not, Your Honor.

23             THE COURT:  Basically your dispute is with

24   respect to the substance of the additional allegations

25   about arrest for armed assault with intention to rob,

 1   Paragraph 53.

 2          MR. KAPPES:  53 through 55, yes, Your Honor.

 3          THE COURT:  Assault and battery with a dangerous

 4   weapon, two counts, Paragraph 54.  For rape, Paragraph 55.

 5   You're just disputing those?

 6          MR. KAPPES:  I'm not disputing the facts,

 7   Your Honor.  I'm disputing the level to which it's

 8   attributed that Mr. Fernandez is a violent or angry

 9   person.

10          I would note for Your Honor, as to those three

11   charges, the first was nolle'd and the second two were

12   dismissed.

13          THE COURT:  Is there any kind of factual

14   background for this?  You say it in your objection letter,

15   for example, as to Paragraph 55 on the rape charge that

16   members of the alleged victim's family came to court and

17   testified that the alleged victim had admitted making it

18   all up.

19          MR. KAPPES:  Beyond Mr. Fernandez's

20   representations to me, Your Honor, no.

21          THE COURT:  You didn't conduct any kind of

22   further inquiry on that?

23          MR. KAPPES:  No, Your Honor.

24          THE COURT:  I see.  Okay.

25          And then for Paragraph 54, that's the assault

1    and battery with a dangerous weapon charge, you're saying

2    that he did not possess a weapon and did not strike

3    Ms. Andujar with a vehicle and didn't tell her "I'll shoot

4    you"?

5                 MR. KAPPES:  That's correct, Your Honor.

6                 THE COURT:  Okay.  All right.

7             And then on the other paragraph, Paragraph 53,

8    that's the armed assault with intent to rob charge, it

9    looks like he denies he was even there, he just says he's

10   across the street at a CVS when the incident occurred?

11                MR. KAPPES:  That's correct, Your Honor.

12                THE COURT:  I guess the suggestion is it's all

13   just a coincidence that all three of these arrests come

14   along and it turns out he's completely free of any

15   responsibility for Paragraphs 53, 54, and 56?

16                MR. KAPPES:  From a judicial standpoint,

17   Your Honor, as I indicated, they were either nolle'd or

18   dismissed.  I think that should go at least to some weight

19   to the factual allegations that were made there.

20                THE COURT:  I see.

21             Government, on this?

22                MR. LEAMING:  Well, certainly the Court can

23   consider the fact that they were nolle'd or dismissed.

24   But I think the Court can still consider it, considering

25   all the facts and circumstances it knows about the

1    defendant.  I would agree that it would seem quite

2    extraordinary that none of these accusations would have

3    any basis in fact.  Certainly the fact that he was

4    arrested and charged and that at least at some point in

5    time victims were making statements regarding

6    Mr. Fernandez's conduct I think can be properly considered

7    by the Court.  As these largely appear to be domestically

8    related, it's not uncommon that they would have been

9    dismissed or nolle'd maybe based on the victim's request

10   or victim's refusal to cooperate.  I think they can be

11   properly considered by the Court.

12            THE COURT:  Does he have other domestic issues

13   with respect to --

14            MR. KAPPES:  I don't believe there's anything

15   pending, Your Honor.  I've been told from the family that

16   there was a charge pending in Massachusetts, but it was

17   dismissed.

18            THE COURT:  I had understood, and maybe I

19   misunderstood this, with respect to -- in Paragraph 61,

20   this is with respect to Ms. Jaslinette Torres.

21            MR. KAPPES:  May I have a moment, Your Honor?

22            THE COURT:  Yes.

23                (Pause.)

24            MR. KAPPES:  Thank you, Your Honor.

25            THE COURT:  So I guess my question there is, I

1     don't know, Ms. Torres might be here today.

2              MR. KAPPES:  She's not, Your Honor.

3              THE COURT:  Ms. Torres is the mother of two of

4     the children, right, Mr. Fernandez's children.  She also,

5     apart from all the other incidents we just talked about,

6     she also, according to the police report, files a report

7     stating that Mr. Fernandez was verbally abusive and that

8     he had become physically abusive toward her, striking her

9     with his fist, and that he continued to make verbal

10    threats towards her, stalking her and following her around

11    the neighborhood.  She stated she was in fear for her life

12    and the life of their son.

13             Granted, that's back in 2013, it's six years

14    ago.  But I guess the question is:  All untrue as well?

15             MR. KAPPES:  I believe -- well, Your Honor, that

16    clearly came from the report.  So I think Mr. Fernandez

17    has a different factual recollection of what occurred

18    during that.  He denies he was ever physically abusive

19    towards her.  And he's indicated to me that the reason

20    that she went forward was she wanted to end the

21    relationship, and that's how she wanted to do it.

22             THE COURT:  By making a false allegation?

23             MR. KAPPES:  I can't say that it was a -- I

24    can't go back and say what she said was false, Your Honor.

25             THE COURT:  Okay.  And I take it then, again,

1    this is I guess the fifth incident now in Paragraph 63,

2    another completely different person from June 2009,

3    Ms. Andujar is claiming that Mr. Fernandez had been

4    physically abusive toward her for the last 18 months,

5    beating her, trying to throw her out a window, putting a

6    knife to her chest, among other things.  She reported that

7    he's abusive toward her even when she's holding their

8    infant child.  All of that is made up?

9              MR. KAPPES:  May I have a moment, please,

10   Your Honor?

11             THE COURT:  Yes.

12                  (Pause.)

13             MR. KAPPES:  Your Honor, again, Mr. Fernandez

14   disputes this.  And he indicates that that child, she

15   never had that infant.  She gave up custody of that infant

16   to Mr. Fernandez and his mother.  So, again, he disputes

17   that that occurred.

18             THE COURT:  So disputes that he told her he was

19   going to shoot her and smash her head against the wall; is

20   that right?

21             MR. KAPPES:  That's correct, Your Honor.

22             THE COURT:  Okay.  Essentially he's been again

23   the victim it looks like five different times of people

24   just continuously alleging that he's engaged in this

25   violent, assaultive-like conduct and has been wrong every

1    single time five times?

2              THE DEFENDANT:  Your Honor, my affiliations from

3    when I was younger led people to think I was a violent

4    person because both of the women are the mother of my

5    child.  So they seen what I used to do and who I used to

6    hang around with back in the day.  That's what they went

7    off of by going to the police station.  And the police

8    station, the first thing they see is he affiliated with

9    the Bloods.  So when she says false allegations, it's

10   completely -- I had custody of my son since he was three

11   months old, me and mom.  She never had the child in her

12   hand.  She hasn't been in my son's life.  He's eleven.

13   She probably seen him a handful of times.

14             THE COURT:  I see.  All right.

15             Anything else on this issue from the government?

16             MR. LEAMING:  The Court may recall, Your Honor,

17   when Your Honor had the hearing on the appeal from the

18   detention order, the government made representations that

19   there was actually five separate restraining orders issued

20   against Mr. Fernandez from it looks like four different

21   women from 2009 to 2015.

22             So not all that, I don't think, is in the PSR

23   but it was brought out during the course of the hearing

24   before Your Honor and in the government's submission.

25   Thank you.

1              THE COURT:  All right.  Well, I don't think

2    these incidents are going to effect the Court in terms of

3    I'm not seeking any kind of upward departure.  But I'm

4    going to take account of these incidents at least as

5    they're recounted, but I'll also take account of the fact

6    that Mr. Fernandez tells me he disputes I guess using

7    violence each and every time in these multiple incidents

8    as reported in the Presentence Report.

9              I have to say, especially when I couple it with

10   what he doesn't dispute, which is this vile language that

11   he uses about harming or hurting Mr. Amaral, it kind of

12   defies belief that each and every single one of these

13   other five times in which there's an allegation that he's

14   involved in violent-like conduct that somehow it's just

15   all been a big mistake.  It's hard for me to believe that.

16   It seems unlikely.  I've never seen another person come

17   into the courtroom, have this many prior incidents and

18   then come in and deny every single one of them.  And a

19   concern I have is if you're denying that and you're not

20   coming even to grips with your vulnerability to hurting

21   other people and to be violent towards other people and

22   blaming people for making false allegations, then I have a

23   real concern whether or not future mental health

24   counseling is going to make any difference to help

25   Mr. Fernandez or anything is going to make a difference in

1    terms of protecting people from a future outburst.  That's

2    really the concern I have here with respect to these

3    allegations.  I'm not making a finding that they're true,

4    but I'm also declining to strike them from the Presentence

5    Report.  I'll just note that the parties have a dispute

6    about them.

7                Okay.  Other than that, are there other factual

8    objections to the Presentence Report?

9                MR. KAPPES:  No, Your Honor.

10               THE COURT:  I'll adopt the Presentence Report's

11   factual statements without objection subject to the

12   reservations we've just made.

13               And the Presentence Report calculates a final

14   offense level of 21 and a criminal history category of II,

15   which would correspond to a 41- to 51-month imprisonment

16   range, a three-year period of supervised release, $15,000

17   to $1 million criminal fine, and a $100 special

18   assessment.

19               I know there's a *Fernandez* departure request, a

20   different case called *Fernandez* from the Second Circuit

21   with respect to the parties' agreement at the time of a

22   37- to 46-month applicable guidelines range, but is there

23   an objection to the correctness of the Presentence

24   Report's guidelines calculations?

25               MR. KAPPES:  No, Your Honor.

1          MR. LEAMING:  No, Your Honor.

2          THE COURT:  I'll adopt those guidelines

3    calculations as well.

4          Mr. Fernandez, when the Court imposes sentence,

5    it ordinarily imposes a number of conditions of supervised

6    release that would follow any term of imprisonment.  Some

7    of those conditions are the standard conditions that are

8    set forth in the Sentencing Guidelines such as reporting

9    to a probation officer.  Others are not to, of course,

10   commit another federal, state, or local offense; those are

11   the mandatory conditions.  But there are so-called special

12   conditions as well that are detailed at Paragraph 96

13   towards the end of the Presentence Report.  And I want to

14   make sure if there's going to be an objection or a concern

15   about those or any other anticipated conditions here, that

16   I hear from Mr. Fernandez.

17         But the first, of course, is not to communicate

18   or otherwise interact with any known member of the Latin

19   Kings or the Bloods gang.  The second is to participate in

20   educational and/or vocational services program.  The third

21   is to participate in a program for mental health

22   treatment.  And the fourth is to submit a person,

23   residence, or office to a search conducted by the U.S.

24   Probation Office.  Do you anticipate any concerns about

25   those conditions?

1          MR. KAPPES:  No, Your Honor.  We've discussed

2   those previously.  There's no objection.

3          THE COURT:  Okay.  All right.

4          So that's it in terms of the technical matters.

5          Mr. Kappes, would you like to proceed, please.

6          MR. KAPPES:  Thank you, Your Honor.

7          Your Honor, in this particular case

8   Mr. Fernandez's arrest likely saved his life or at least

9   preserved the ability for him to change his course.  From

10  Your Honor's recitation of the factual information in the

11  Presentence Report as well as being involved with the

12  sentencing of the other individuals involved, there was a

13  lot of violence and drugs.  And that was foremost in

14  Mr. Fernandez's life.  And had this arrest not happened,

15  he possibly would be dead or in substantial harm.  And

16  this arrest saved him.

17          I know that I've been working with him for more

18  than a year now, I think 16 months now, and Mr. Fernandez

19  is a drastically changed person.  And I think the letter

20  from the Department of Corrections bears out the steps

21  that Mr. Fernandez took to alter his life and he's

22  undergone the thought process of what was I doing and how

23  do I not do that again.  That program is very challenging

24  and it's not something that is undertaken lightly or that

25  people succeed with any type of regularity.  Mr. Fernandez

1    has done it and he has expressed to me, he'll express to

2    Your Honor, happiness of not being around that life.

3    Obviously --

4              THE COURT:  I'd love to hear a little bit more

5    about what that program has done.

6              MR. KAPPES:  And Mr. Fernandez is going to

7    address the Court at length.

8              THE COURT:  That's great.

9              MR. KAPPES:  So I stand here to say that

10   Mr. Fernandez's life has changed dramatically and he's

11   going to describe in great detail for the Court those

12   changes and what he'd like to do with his life in the

13   future.

14             There was one error that I made in my request.

15   I had asked that he be designated to a facility as close

16   to Connecticut as possible.  However, it should be

17   Massachusetts where his family is from.

18             THE COURT:  Springfield area, right?

19             MR. KAPPES:  Yes, Your Honor.

20             May I have Mr. Fernandez speak?

21             THE COURT:  Of course.

22             THE DEFENDANT:  Your Honor, I would like to

23   say --

24             THE COURT:  Mr. Fernandez, let me have you come

25   up here to the lectern in front, if I can.

1       THE DEFENDANT:  I'd like to thank the Court

2  first for allowing me to attend my father's wake.

3       With that being said, the program -- I'm not

4  disputing what the females said.  My growing up history

5  and my past, I was confused and thought violence and

6  terror was the way to get your point across.  I'm not

7  disputing every allegation, and I do take responsibility

8  for most of them.  But the two ones that I know that's not

9  true is one was I was 19 years old with the mother of my

10  child.  The other one I was 23.  Age shouldn't matter to

11  my responsibility, but I do feel bad for what I have done

12  or what I continue to do to people, in other words.

13       But I take responsibility for poisoning the

14  community.  I take responsibility for the fentanyl that's

15  poisoning this whole society.  It's the number one drug

16  that's killing people.  I look at the damage it's done to

17  my family.  I look at the damage I probably caused to

18  family.

19       The gang program I completed as part of a 23 and

20  one program, you come out for one hour a day.  You're

21  around numerous gang violence.  One fight happens, the

22  whole facility gets locked down for seven to ten days for

23  investigation to see whose part is it.

24       THE COURT:  Where were you doing that gang

25  program?

1           THE DEFENDANT:  Corrigan.

2           THE COURT:  Corrigan.

3           And were there others involved or other -- how

4    many others, roughly, were there?

5           THE DEFENDANT:  What's the question?

6           THE COURT:  About how many other inmates were

7    part of that program?

8           THE DEFENDANT:  Over hundreds.  There's two

9    pods, E pod and B pod.  Each has around 52, 54.

10          THE COURT:  So what does the program actually

11   mean?  It sounds like a lot of time in the cell.

12          THE DEFENDANT:  Yeah.  When you're not in the

13   cell, you're doing one-on-one programs with the counselor,

14   rehabilitation programs.  Mental counseling comes almost

15   every week to talk to you about.  There's numerous

16   progress we had to make.

17          THE COURT:  Right.

18          THE DEFENDANT:  And the incidents in one, they

19   put you in the cell with someone that's not affiliated

20   with you.

21          THE COURT:  Right.

22          THE DEFENDANT:  To see if you can coexist.  And

23   the time I was, I was with four other affiliations.

24          THE COURT:  How did that go?

25          THE DEFENDANT:  Good.  I completed it.

1           THE COURT:  Right.  What was the best part of

2   the program, if there was a best part?  Or what helped you

3   most?

4           THE DEFENDANT:  Knowing that I could decide from

5   negative situations.  If there's a fight broken out, I

6   probably would have been the first one to run and jump in

7   and try plead my loyalty to the gang.  I realize the

8   gang's done nothing to me but tear my family apart, broke

9   me down mentally, physically.  The same people I thought

10  was my friends have turned their back on me.

11          THE COURT:  You've got some family members

12  nodding behind you when you're saying that.  That's very

13  true, the folks who are sitting behind you, they're your

14  friends, they're your support.

15          So you have plans from here.  What are your

16  plans?

17          THE DEFENDANT:  To build a career.  I want to

18  try to get my GED, learn to read and write.  A wise man in

19  jail told me, he asked me if I would die for my kids.  And

20  of course I said yes.  But he told me it's for me to start

21  living for my kids.  And doing that is making the right

22  decisions for them, putting them instead of what I wanted

23  in the streets, what I wanted financially and realize

24  money ain't the way or drugs ain't the way to get that.

25          And today I think if I caused death towards the

1    fentanyl.  Me seeing my father in the casket realized it

2    could be taken away just like that.

3              THE COURT:  Right.

4              What do you think led you to get as angry as you

5    did when you talked to Velez over the phone?

6              THE DEFENDANT:  Him shooting at me and a couple

7    of my friends, Ms. Torres.  And that's part of my -- I got

8    bipolar, ADHD, I snap in an instance.  That was -- knowing

9    that my friend just got shot probably like two weeks

10   before that situation and then deal with it again, and

11   then there's more of a reaction than just sitting back.

12   That's what I could say the gang program taught me is to

13   sit back, analyze the situation, and realize don't go over

14   emotions.  Any reaction is a reaction.

15             THE COURT:  Right, I understand.  Okay.

16             How long does the gang program take?

17             THE DEFENDANT:  Ten months.

18             THE COURT:  And how many guys make it through

19   it?

20             THE DEFENDANT:  You got guys that's four-timers,

21   two-timers.  And every time that you're in there, it

22   goes from -- if you're a two-timer, you have to do two

23   years in the program.  Four times.  There's guys in there

24   that's got life and they don't want to get out.

25             THE COURT:  Are there guys who kind of crash out

1   or fail out of the program?

2           THE DEFENDANT:  Yeah.  I seen multiple people

3   come back probably three or four times in the program.

4   Like it was a revolving door for some of the people.

5           And I done court -- not conflicts but when you

6   renounce your affiliations, there's always backlash

7   towards that.  Like there's a saying "Blood in, Blood

8   out."  You can't just walk away from us.  There was issues

9   that I had to walk away from the situation and swallow my

10  pride, when before I would have probably got into a fight

11  or something.  Me being incarcerated for 16 months, not

12  one ticket, Your Honor.

13          THE COURT:  Great.

14          Anything else you want me to know?

15          THE DEFENDANT:  No.

16          THE COURT:  Okay.  Thank you.

17          THE DEFENDANT:  Thank you.

18          THE COURT:  Mr. Kappes, anything else or any

19  family members want to say anything?

20          MR. KAPPES:  No, Your Honor.

21          THE COURT:  Government.

22          MR. LEAMING:  Your Honor, I don't really have

23  much to add other than what's in the sentencing

24  memorandum.  I'm happy to answer any questions the Court

25  may have.  I'll otherwise rest on my submission.

1            THE COURT:  Thank you.

2            Mr. Kappes, anything else?

3            MR. KAPPES:  No, Your Honor.

4            THE COURT:  I'm going to turn to the imposition

5    of sentence at this time.

6            I want to talk to you first, Mr. Fernandez,

7    about what it is I've thought about in deciding what's an

8    appropriate sentence.

9            I have to think about what are the purposes of a

10   sentence.  And the purposes of a sentence, as I'm sure you

11   know, they include things like what reflects the

12   seriousness of doing something like distributing what you

13   already called poison into the community.  I have to think

14   about reflecting the seriousness of the offense, promoting

15   respect for the law.  I have to think about deterring and

16   discouraging obviously not only the distribution of drugs

17   like heroin and fentanyl, but also you've heard me talk

18   about the violence, the concern about that.  And I have to

19   think about rehabilitation, essentially helping you put

20   pieces in place, which it sounds to me you're already down

21   the road thinking about those things in terms of

22   supporting you as you try to make very different choices

23   in the future.

24           The way I do that is, of course, based upon

25   everything I know about what it is you did wrong that

1    brings you into the court system, but also the rest of

2    your life.  You've had plenty of challenges in the rest of

3    your life.  We haven't talked a lot about that here in

4    open court here today, but I've learned a lot about that

5    from the Presentence Report.

6            I have to think about the Sentencing Guidelines

7    and what they recommend here, how it is actually you've

8    agreed how the guidelines should apply with the government

9    here.

10           I have to think about the need to avoid any kind

11   of unwarranted differences in the sentence you receive and

12   the sentence someone in similar circumstances as you would

13   receive.

14           Basically, I've got to think about everything

15   I've learned and know about you, both the "good" and the

16   "not so good," and decide on a sentence that's fair,

17   that's just and reasonable, and also no greater than

18   necessary to serve the purposes of sentencing.

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  That's basically what I'm trying to

21   do here.  It's not a perfect process, but it's what I'm

22   trying to do.

23           For you, I have thought about -- you know the

24   concerns here clearly, right?  It's not just the very

25   lethal drugs that you decided to be involved with and, you

1   know, getting involved with the gang the way that you did

2   here that kind of adds a multiplier effect to everything

3   you do and certainly raises the possibility of violence in

4   a very clear, graphic way that was caught on tape in your

5   conversation with Mr. Velez, and in light of what you saw

6   happening to people that you knew and how you reacted to

7   that.

8           You've heard my concern here about other acts

9   when you were much younger, I grant that, I realize that

10  we're much more impulsive when we're younger, but other

11  acts that suggest violence.  And I think it's a bridge too

12  far to say all of them were somehow, you know, you were in

13  the wrong place, wrong time.  I understood when you talked

14  to me now that you took a little bit more responsibility

15  for having stepped over the line in the past.

16          As I balance that in terms of those concerns

17  that I fully understand why the government proceeded in

18  the case against you.  I know it's really your first time,

19  certainly your first time in federal court, it's

20  practically your first time certainly by your first formal

21  conviction that we have.  I know you have the incident up

22  in Massachusetts, but it's your first formal conviction

23  here.  That counsels for me a little bit in favor of

24  leniency notwithstanding the fact that you've had a lot of

25  brushes with law enforcement before.  I think you've had a

1    lot of challenges with your childhood and the incentives

2    that you were given, and the lack of guidance, and frankly

3    bad guidance, especially about firearms in the household.

4    And you're candid about the fact that you've had some

5    challenges not through fault of your own being learning

6    disabled in some ways in terms of reading and being able

7    to do the academic work.  And then you've told me already

8    and there's some support in the Presentence Report about

9    some of the mental health challenges, bipolar and the

10   like, that you face.  To me, those all weigh in your favor

11   in terms of leniency.

12          The fact that your family is here and supporting

13   you the way that they are says really good things about

14   you because it suggests to me that you're somebody who, I

15   hope -- I think you realize that, but they're the people,

16   they're your gang, your family.  They're also, unlike gang

17   members, they're hopefully going to ask hard questions for

18   you, because you're going to get out of prison, right?

19   You're going to start a life, you're going to be back with

20   your kids, lovely wonderful kids that they look like.  And

21   then the question will be, all right, what are you doing

22   to -- how are you occupying your time, right?  I know you

23   give lots of support to the family, I have learned that

24   from the letters of support.  How are you doing it in

25   terms of building a career, right?  Something that your

1   kids can look to and be really proud of their father for.

2   And that also brings support in, right, for the family.

3          So I hope you're thinking a lot about that.  It

4   seems to me you're starting to think about that, your mind

5   is a bit clearer now than it had been.

6          So it's your family and it's also I've

7   appreciated your remarks today because it is pretty clear

8   to me you're thinking hard about how you change and make

9   very different choices.  You're impressive.  And you know,

10  you have a lot to build on.  You really could build on it.

11  And you could never see another courtroom again and you

12  could be off to the races with your family supporting you

13  and helping you and being a vital member there, basically

14  honoring your memory.

15             THE DEFENDANT:  Can I add something to it?

16             THE COURT:  Certainly.

17             THE DEFENDANT:  I plan on trying to go to barber

18  school while I'm in the facility I'm at.  And I hope to

19  try to break the cycle that has been around my family.  My

20  grandfather being incarcerated all his life, my father,

21  and now me.  I don't want my kids to do that.

22             THE COURT:  No.  They're treasures.  Those kids

23  of yours are treasures.  I'm glad to see you see that.

24             THE DEFENDANT:  Thank you.

25             THE COURT:  So, you know, all in all, as I look

1    at all sides here, I am inclined to accept Mr. Kappes'

2    recommendation concerning the sentence that I should

3    impose in the case in large part, really in large part

4    because of how you've presented to me today.  I came in

5    the door actually thinking I was going to impose the

6    sentence Mr. Leaming was suggesting.  I want to give you

7    some benefit of that, and I'm going to give you the

8    benefit of that and impose a sentence at the agreed-upon

9    lower range that you agreed upon in hopes that you're

10   really going to grab this opportunity and move forward as

11   soon as you can.

12          So I'm going to ask you to stand, sir, at this

13   time for the imposition of sentence.

14          Mr. Cruz Fernandez, for the reasons I've stated,

15   I'm imposing a sentence of 37 months of imprisonment,

16   that's the bottom of the agreed-upon guidelines range.

17   I'm departing downward pursuant to the *USA v. Fernandez*

18   case that the parties have cited.

19          Your term of supervised release once you're

20   done -- I assume you'll get credit for the time you've

21   already been in, so it will be shorter than 37 months, in

22   practice -- will be a three-year term of supervised

23   release.  I'm going to tell you some detailed conditions

24   on that in a moment.

25          I'm not imposing a criminal fine.  The reason is

1    you need to be saving all the money you earn for your kids

2    and for you to build up your career.

3            And I'm imposing a $100 special assessment

4    because I have to do that.

5            The conditions of supervised release will

6    include the standard conditions under the Sentencing

7    Guidelines under 5D1.3(c).

8            The following mandatory conditions are imposed

9    that:

10           You will not commit another federal, state, or

11   local offense.

12           You may not unlawfully possess a controlled

13   substance.  And I'll explain marijuana is a controlled

14   substance under federal law, so you have to stay away from

15   that, as tempting as it could be to use it.  But you need

16   to do that.  The other reason is it really starts to warp

17   your judgment if you're getting high.  And then you make

18   different bad choices.  So that's why during the term of

19   supervised release you have to stay off the marijuana.

20           And towards that end, another condition is that

21   you'll refrain from the unlawful use, not just the

22   possession, but use of a controlled substance.  And you'll

23   have to submit to a drug test within 15 days of your

24   release and at least two periodic drug tests thereafter.

25   And the probation officer could decide, especially if

1    there's failures on those, that there should be more than

2    that.

3              And you'll have to cooperate in the collection

4    of a DNA sample.

5              Those are the so-called mandatory conditions.

6              And then I'll also impose the special conditions

7    that I already reviewed from Paragraph 96 of the

8    Presentence Report, which is:

9              No hanging with the gangs, any member of the

10   gang absent permission of the probation officer.

11             To participate in educational/vocational program

12   as specified in Paragraph 96.  The whole idea there is if

13   it's barber school, if it's whatever kind of program,

14   you'll probably get it funded by the Probation Office in

15   whole or in part, at least, to try to basically give you

16   the skill set that you want to improve your ability to

17   land a great job.

18             And then you'll also be required, of course, to

19   do mental health treatment.  And the concern there is

20   you've had troubles in the past, right, with flying off

21   the handle.  So the question is how are you going to

22   handle that in the future.  So I want to make sure that

23   you have that support, basically meeting a counselor,

24   talking about how you're feeling about things.  It doesn't

25   mean you're weak, it doesn't mean you're crazy; it just

1   means you're getting help as many people do to try to deal

2   with the stresses of your life.  I hope you'll take

3   advantage of that.  It sounds to me you already realize

4   that from the way you were talking about the gang program,

5   you realize how important that is in terms of having kind

6   of a neutral voice on the outside giving you advice and a

7   sounding board.

8          And then of course you'll be subject to a search

9   of your person, your residence, house, or office or

10  vehicle based upon reasonable suspicion of contraband.

11  Hopefully that will never come to pass.

12         So those are the conditions of supervised

13  release.

14         That's the sentence the Court is imposing.  Is

15  there any reason why the Court cannot lawfully impose the

16  sentence I imposed?

17         MR. LEAMING:  No Your Honor.

18         MR. KAPPES:  No, Your Honor.

19         THE COURT:  The judgment of the Court will be

20  prepared by the Clerk's Office.

21         I will make a recommendation, as to designation,

22  to a specific facility or one as close as possible to

23  Springfield, Massachusetts?

24         MR. KAPPES:  Yes, Your Honor.  Based upon

25  Mr. Fernandez's use of marijuana, perhaps the RDAP program

1   facility that is as close to Springfield with that

2   program.

3           THE COURT:  Okay.  I'm not sure if the length of

4   the sentence will be long enough, given the time he'll

5   have credited.  I'm happy to make a recommendation as

6   close as possible to Springfield, Massachusetts, that also

7   has an RDAP program.

8           MR. KAPPES:  Thank you, Your Honor.

9           THE COURT:  I'll do that.

10          I want to make sure, Mr. Fernandez, that you

11  know that you have a right to file an appeal from the

12  conviction or the sentence that the Court's imposed under

13  certain circumstances.  It may be subject to limitation by

14  the plea agreement that you have.  But the important thing

15  is if you wish to file an appeal, you would have to do so

16  within the next two weeks or 14 days.  And if you could

17  not afford counsel to represent you, you'd have counsel

18  appointed to represent you.  Do you understand that, sir?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Okay.

21          Anything else to take up?

22          MR. KAPPES:  May I have a moment to speak to

23  counsel?

24          THE COURT:  Certainly.

25              (Pause.)

1          MR. KAPPES:  Thank you, Your Honor.

2          MR. LEAMING:  Nothing.

3          I was just verifying, Your Honor, I couldn't

4   remember if there was additional counts.

5          THE COURT:  Yes, I think Ms. Gutierrez is

6   telling me there's some.

7          MR. LEAMING:  I move to dismiss all other counts

8   pertaining to Mr. Fernandez, Your Honor.

9          THE COURT:  So all remaining counts not the

10  subject of the plea agreement are dismissed.

11         Okay.  Anything else?

12         Thank you all.  Good day now.  Stand in recess.

13              (Proceedings adjourned at 1:53 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4        RE: UNITED STATES OF AMERICA v. CRUZ FERNANDEZ
                      No. 3:18CR90(JAM)

5

6             I, Diana Huntington, RDR, CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages 1 through 34 are a true and accurate

10   transcription of my shorthand notes taken in the

11   aforementioned matter to the best of my skill and ability.

12

13

14

15

16                    _____/s/_____

17                    DIANA HUNTINGTON, RDR, CRR
                        Official Court Reporter
18                    United States District Court
                       141 Church Street, Room 147
19                    New Haven, Connecticut 06510
                          (860) 463-3180
20

21

22

23

24

25